Good morning, your honors. May it please the court, counsel. My name is Sean Conklin. I'm with the Office of the State Appellate Defender, and I represent Tommy Crockwell, Sr. Mr. Crockwell's trial started as a jury trial and ended as a bench trial, after which he was convicted of two counts of first-degree murder. The oral sentencing order merged the two counts and imposed a single 50-year sentence, while the written order failed to merge the two counts and imposed two concurrent 50-year sentences. We've raised two issues on appeal. One of those issues is just meant to clean up the discrepancy between the two sentencing orders. The state has agreed that something needs to be done on that issue and is contesting only the manner in which your honors grant relief there. And because the end result is the same either way, I'm going to be spending my time on the other issue unless your honors have any questions. That other issue is ineffective assistance of counsel for the failure to call a known and available alibi witness. Now, the analysis on that issue was somewhat narrower than it would be in an ordinary case because the state has not contested, at least on this record, the substance of that claim. In other words, the state has not argued that based on the facts that we know, the decision not to call that witness was not efficient or was harmless. Rather, the state has made two procedural points, one being that the record is not sufficient to reach the issue, and the other involving invited error largely because Mr. Crockwell persisted with that jury waiver, that mid-trial jury waiver. Now, I'll deal with the invited error first because that's easier, I think, to dispose of. Invited error as a concept has very little utility in the context of ineffective assistance of counsel. Many cases in many jurisdictions agree with that proposition. That's largely because the error that's being raised in an ineffective assistance claim is analytically separate from the deficient performance or the underlying issue that led to the ineffective assistance. In other words, it is possible to somehow have waived the underlying issue and still obtain relief from the ineffective assistance because that is, again, an analytically separate right that's being asserted. But to put it another way, virtually any claim of ineffective assistance is going to involve some kind of error that's injected by the defense. So it's not the underlying error that we're worried about. It's the deprivation of the Sixth Amendment right. But going to the why you even call this, I mean, this witness, you know, obviously if this thing went to a jury, went to a conclusion as a jury, it has to be a lot easier. You promised the jury you were going to do it, didn't you? You know, I was going to come in there and testify and help my old friend out. But then I got thinking about it. I'm not putting my neck on the chopping block to do it. Who knows? We don't know why he did it. So it is better for a PC. So what we have here, and Your Honor, I would concede at least this much. Many of the cases that I cited in the brief are PCs and involve evidentiary hearings involving that very issue. Why was the witness not called? In this case, what we have are a number of representations from counsel, both of what the witness would have said and why he was not called. In other words, it's our position that the record here is as explicit, or at least counsel was as explicit as he could have been under the circumstances. The way I like to put it is the record has not been scripted for this issue. And I'm not taking a chance on lying to the court. So now you're telling the judge that your guy hit the alibi was a lie, and you don't want to go there. So, I mean, we don't know if that happened, but that's certainly a possibility. We still don't know why he did it. And it seems to me without a record, how can we know if it was ineffective to not call the felon? Well, our position would be, first off, that in that situation, it's not necessary to tell the judge anything. Instead, this attorney volunteered certain information, and as an officer of the court, I believe that we have to take his word for it until that word is contradicted. But we don't have to assume that he told the judge everything he knew because he didn't have the duty to tell the judge everything he knew. Well, it's our position that when we look at the record as a whole, particularly counsel's explanations for why he proceeded the way that he did, he gives a comprehensive answer for why he didn't call this witness. And, again, I think it's important to look at the context of the entire record. But even if you – and his reason was, well, I got this corpus delicti argument, right? Well, even if he had a corpus delicti argument, he couldn't hurt himself by calling this alibi. That wouldn't affect the corpus delicti. Well, I certainly wouldn't agree with that, Your Honor. Okay. So you still got to think that maybe there's some other reason behind it because calling that witness and then making your corpus delicti argument, that doesn't answer the – the fact that he says, I got this corpus delicti argument still does not answer the question as to why he didn't call this witness. Well, I would – I believe it's – I believe it's akin to proving the negative. You know, we can give – I can give you as many reasons. Well, isn't that what – I get your point. Isn't that what an evidentiary hearing is for? I mean, it's over here. Well, Your Honor, I suppose the response to that is that, you know, if Your Honors do not agree that the record is sufficient – and again, our position is that it is sufficient. And that's because in the context of everything that happens, everything counsel says, there is a comprehensive reason on the record. And I believe it's comprehensive enough that, you know, I'm obligated to raise it for fear of waiver or forfeiture later on. And if that's – and if that's the case, then it's sufficient for Your Honors. However, if you disagree, what that does is push the case down the road. And if you disagree with my position, I'm sure Mr. Crockwell will be filing a PC in the future. But again, our position is that we have a comprehensive reason on the record for why this gentleman was not called. And now is the time to act on that. And the downside for Mr. Crockwell if we decide that we don't have a sufficient record is delay? The downside would be delay. The downside would be delay. There's no other downside? I cannot think of – I cannot think of one, except to say, again, it's appropriate to deal with now. And – or rather – I did just think of one. And that is – and I think we've seen this in other cases where issues are touched upon in the direct appeal or not touched upon on the direct appeal. And the circuit court judges dealing with these PCs have a sort of different idea of what forfeiture is, the res judicata is, than their more academic compatriots in the appellate court. And so I think it does cost more than just the delay of filing a PC, which he would have to do without – initially without the assistance of counsel. And there's also danger there because not everyone is – you know, I don't know Mr. Crockwell well enough to say whether he would have a particular aptitude to drafting a PC. I think it's always preferable if we can do things on the direct appeal to do them on the direct appeal because every step that we inject into the case is an opportunity for error. So that's what I say the downside is. There are delays, but there are also potential mistakes. But then we would have to assume that there was no legitimate reason or tactful reason for not calling this guy based on what he might say. And so we're doing some guesswork there. Well, again, our position is that respectfully you're not doing any guesswork because this attorney was very clear about why he chose the path that he did. And I recognize the concern that there might be a B or a C, you know, a further list of reasons. But again, the overall record here provides a comprehensive reason for why this attorney proceeded the way that he did. I'm just wondering if the concern that you have expressed about the trial court perhaps finding race judicata or something could be avoided by the way we write an order to make sure that it's rejected at this point. I have no reason to doubt that that would work. But again, I just have to stress that at this point we believe that the record is sufficient and that it is in front of your honors and that it's appropriate to deal with it now. I would like to – that discussion covered most of my points. But I would like to briefly discuss prejudice even though the State hasn't raised it because this is a case in which we have what amounts to a confession. And what we have to be careful of in this case is that to put it in – well, I'll put it this way. The State's position below was essentially that Tommy Crockwell had to have been the shooter because his statement to his friend Anton Davis contained details that only the shooter would know. We don't believe that that's true. I think if you look at that statement and compare it to the fiscal evidence and the other evidence that we have, that the details that are in that statement are generic, they're public knowledge, they are – and in some cases they appear to not match up with the fiscal evidence. But what's that have to do with the points you raised here? Well, because I have to show prejudice for having failed to call the witness. And I just want to make it clear that we don't believe that – despite the fact that there is this recording of Mr. Crockwell taking responsibility for this crime, that we do not believe that the evidence is overwhelming. And we believe that an alibi witness would have changed the result, or at least would have been likely enough to change the result to constitute an indicted assistance. Because, again, the details of the statement don't necessarily match up with the evidence that we have or are details that appear to have been common knowledge. If I remember correctly, the authorities thought that it was Mr. Crockwell's son who might have actually done the crime. Well, it's interesting because the context for all of this is pervasive rumors that Mr. Crockwell's son, Connie Jr., was the shooter. I'll just two minutes. Thank you. Those rumors were so pervasive that the chief of police at University Park told Anton Davis, his cousin, that Tommy Crockwell was the shooter. Now, Anton Davis didn't know at the time, but the chief of police was referring to Tommy Jr. Anton Davis was a childhood friend of Tommy Sr., and that's how Mr. Crockwell, the defendant, got pulled into this case in the first place. But the chief of police, at the very least, did believe that it was Jr. who was the shooter. Interestingly, though, his officers, or at least the officers of the Will County Major Crimes Task Force, had apparently, I'm not sure of the timing exactly, but had apparently already discounted Jr. as a suspect. And, in fact, there were a number of theories about the case, including theories involving a number of other parties not a part of this litigation, who may have been retaliating against the victim. Jr. was one of those people. However, the police witnesses were very insistent at trial that at no point until Mr. Davis came forward was there an actual suspect. And they had apparently, again, discounted Tommy Jr. because he was in a hospital in Chicago at the time. And so it's unclear why the police chief would be sharing that kind of information with anyone, but let alone in the circumstances it did. And I think that he did. And I think that it shows just how dangerous a situation Jr. was in and that Tommy Sr. was facing vis-à-vis his son. Because here is a situation in which the top law enforcement officer of the city is going around telling people that he's the shooter. So you're arguing that Daddy confessed to a murder he didn't commit? That is the argument. You know, I love my son more than the next breath I'm about to take, but I'll tell you what. I can't imagine confessing to a murder I didn't commit. Your Honor, it's not necessarily something that I would have done, but I will be frank. I say that, but I don't know what I would do in that situation. And if the thought had occurred to me to do that, I would be talking myself out of it as opposed to not having the thought. Counsel, time is up. Thank you very much. Mr. Amwood, some rebuttal. Not rebuttal, some argument. I'm getting ahead of myself. May it please the Court. Counsel, good morning, Your Honor. My name is Nicholas Atwood, and I represent the people of the state of Illinois in this matter. I will also focus my argument on the ineffective argument, because that seems to be the primary concern of the justices. The defendant wants this Court to believe that his trial counsel voluntarily elected not to present an alibi witness in favor of waiving the jury and making a suspect, as the defendant calls it, a legal argument. Frankly, this is an absurd conclusion to make from the record. I think we showed in the brief that counsel's trial strategy from a year prior to the beginning of the trial was we have this alibi witness, LaRoy Wright. We're going to put him on. The defendant was with him that night. He was with him when Johnny Rouse was murdered, and he was on his way to another city at that time. That's a pretty concrete alibi as long as your witness is going to testify to that. As we get to trial, we note in the brief that there were ten different subpoenas that were required to obtain LaRoy Wright's presence at trial. He actually skipped what I call the first trial date, which counsel says that's a false statement in his brief, but the trial was originally set for September 12th. That trial had to be continued because they couldn't get service on LaRoy Wright. So I say when he failed to appear for the first trial date, it had to be continued because LaRoy Wright was unavailable, which you think is kind of an odd situation. The defendant was with this guy on that night. They're smoking marijuana together. They're playing video games with friends, as Justice Smith pointed out. Wouldn't you testify on behalf of your friend voluntarily if you were his, in fact, alibi? And I think what that goes to show is, as Your Honor stated, there are a lot of reasons that LaRoy Wright may not have wanted to testify. And when we get to the trial, he does show up on the 24th of October, which was the first date for picking the jury. But then on the 26th, counsel informs the jury that Wright's going to testify in his opening statement. Then again on the 27th, counsel informs the judge he's still planning to have Wright testify when they put on their case in chief the next day. But we have no LaRoy Wright. The next day he comes around, counsel's completely reversed course, and now he's waiving the jury. He's instructing the defendant to waive the jury, and they're going to proceed on this legal argument that they made once the state's evidence has been presented. And so I think that clearly shows that after court ended on the 27th and before court started on the 28th, perhaps counsel met with his client and or Wright and discussed this matter. And Wright may have instructed him, I don't want to testify for, as Your Honor stated, any number of reasons. It could have been because he was an accomplice, as we alluded to possibly, which was pure speculation, which we clarified in the reading. It could be because his testimony didn't match up with the defendant's. Perhaps Wright wasn't with him all that night, and the defendant had not been honest with his counsel. Perhaps their dates were confused. And I think that's why the People v. Logan case is such an applicable case for this court's decision. We had in that case an alibi witness being told to the jury in an opening statement. The attorney ended up not calling that alibi witness. And his client did what he should do in that situation. He raised it in a post-trial motion. Well, didn't the defendant at some point in his statement say that somebody was driving him? He did. Somebody was driving him around, so the alibi witness gets on the stand and puts himself in a car with the defendant, whose confession states that he had a friend driving him around looking for the victim. Yeah, it's certainly a risky situation because, as was mentioned in the record, Crockwell did not know this individual from what we can glean from the record. It was a 19-year-old kid. Crockwell is a man in his mid-40s, lives in another town. Apparently he doesn't know him. There's some evidence that maybe Crockwell Jr. knew the victim, but we're not 100% certain on that. But Crockwell probably needed someone to identify this person for him, and there's evidence in the— I believe it was from the transcript when Anne Fon Davis wore the wire, Crockwell talks about somebody pointing him out of the liquor store for the victim his later murder. So I think, you know, clearly there would be risk in saying, yeah, I was with this guy on that night. And even if he was with him, it doesn't disclose the fact that there still could have been this crime committed. They were together, and as I pointed out in the brief, the warden might have been a block or half a block from where this murder took place. All of those things, playing video games, driving the defendant home, that could all occur, and so could the murder. There's no reason to think the timeline wouldn't match up. But, I mean, doesn't your argument sort of rely on the fact that it would be ineffective assistance to, for one year, hold out that this is going to be your witness, and then not until you've had him there for four days do you investigate enough to find out that the story doesn't match up? I mean, at this point, this is what you've been preparing for? And do you think that the preparation would be done? And doesn't that lend credence to that there wouldn't be a strategic reason? I agree that it would if that were the case, but I think the record does show that the investigators have been trying throughout this entire time to speak with LaRoy Wright, and there is some reference. I believe the defense counsel does say it during the report of the proceedings. I can't recall the page. He does talk about the state had spoke to LaRoy Wright, that information would have been disclosed to the defense. He was aware that the statement matched up because he knew what LaRoy Wright was supposedly going to testify to, and I think he relied on that as well as relying on defendants' representations to him about what his situation was that night and the fact that he had an alibi witness. And I think part of the problem is counsel, it appears in the record, could not get a hold of LaRoy Wright. I don't know if LaRoy Wright was actively trying to avoid service, or if he was just busy. It's impossible to know, but whatever did happen is that at some point during the trial, counsel became aware that, okay, this may not work. And that's what the Logan case discusses. They had a post-conviction proceeding in that case where counsel was allowed to testify to what happened. And what he stated was that the alibi witnesses, when I was able to finally meet them, which happened during the trial, was they didn't want to testify. Their days did not match up. In that case, the defendant had claimed he was in Milwaukee when the crime had occurred in, I think it was Chicago. And when the alibi witnesses spoke to counsel, they didn't corroborate the defendant's story. You can imagine how that would look in front of the jury if you put this man on the stand, and all of a sudden he's saying something that's contradictory to what you already told the jury he's going to say. That might leave you dead in the water right there. So I think counsel made the best of a bad situation. I think he became aware of new information. Assuming you're right. Assuming you're right. And that right there illustrates the need for the post-conviction because all of this is speculation and assumptions because the record does not state why counsel didn't call his witness. And throughout his brief, the defendant characterized this thing as an available known witness. Well, he's certainly known, but we don't know if he was still available. That's the question here because when counsel started to explain why he was proceeding in the manner in which he did when they weighed the jury, he said, well, there's reasons. I'm not really going to get into all that. But suffice it to say, this is the way we're going to proceed. And in a post-trial motion, I believe he makes one reference to the fact that there wasn't there was only one African-American on the jury, but he doesn't elaborate further. But he said there were reasons. And I think it's also prudent, as one of the justices mentioned, he's not going to come up here and explain, oh, well, our alibi witness isn't really going to be an alibi anymore. So he's got to act in the best interest of his client when he's representing himself to the judge. So he's not under any duty to disclose all of his strategy and what he's thinking in that context. But he's got to tell the judge, we've elected to proceed another way. We're not trying to waste the court's time. But suffice it to say, it's going to be better if we move to the bench trial. And I think given the facts that were here, the corpus collicti argument was really the best argument that was left available because we have a confession of this defendant, a fairly graphic confession. It did include details that tended to establish that he had some sort of insider knowledge. But under counsel's reading, the people be sergeant, which is one of the cases he cited when he argued, it was still a plausible legal argument to make. And I think it was certainly the better of a bad choice proceeding without the alibi witness that you expected would be there to testify. You told the jury about, and now all of a sudden he's not there. I think that raises a reasonable doubt in and of itself. With regard to what the appropriate remedy is and the fact that PC would be probably the best situation because counsel would then be able to testify in an evidentiary hearing and Justice McDay expressed concern, what if we're going to inject future errors by remanding? What's the harm of the defendant here? Other than delay, I don't think there would be a problem with remanding this case because we don't have, he'll be able to survive first stage here. But we don't have any new evidence that we can admit in second stage by the state to dismiss the case. So a third stage evidentiary hearing is really where this has to end up eventually. So I think if the court were inclined, they could do that because sooner or later, this case will end up back in this court on appeal. And the only way that we can dispose of this issue properly is for defense counsel to testify. This is the reason why I didn't call the Lord Wright because it's just not here. The record doesn't contain that information. And we would have to, this court would have to speculate, basically make assumptions based on speculation as to what was in defense counsel's head. And we can't know for the purposes of a Strickland analysis, you know, what would a reasonable attorney do in that situation because we don't know the facts that were available to that attorney when he had to make that decision. It could be that, you know, one of these, you know, speculations that I presented, you know, the L.Y. witness didn't match up or one of the others was in form of a defendant. And he's like, okay, well, that's not going to work. We need to do something else. I wish I'd known about this before, but, you know, he can't go back in time. And I think there was sufficient work on his part to obtain that information. There were attempts to subpoena, attempts to contact the Lord Wright. The fact of the matter is, there's just not enough information in this record to make a decision where we would reverse the decision in this murder trial based on an assumption or a speculation as to what counsel was possibly thinking of. And as far as the invited error argument, one thing I would point out, counsel has replied to me and stated that the issue here is not the jury waiver for the invited error. It's the decision not to present the witness. But I think those go hand in hand because it's clear when your witness is going to be testifying and that's your strategy all the way through, and then you decide, okay, we're going to waive the jury and make a legal argument that that was out the window. And so the defendant would have had to personally agree to the new strategy, which would have required waiving the jury. Because you're not going to argue for a directive finding, which the defense counsel did, or the corpus licti in front of a jury. You're going to make that legal argument to a judge who's going to know and apply the law properly. And so I think because those go hand in hand, Crockwell has, you know, agreed that this is the procedure we're going to do. So to complain about that procedure on appeal when he's agreed to it, I think is part of the invited error doctrine. Of course, that's not a limitation on this court. You could elect to hear the merits anyway. But I think this case is a bit unique because the defendant in this case had the opportunity to observe all the state's evidence presented at trial with the exception of, I think, some testimony regarding the physical evidence. And so he sat and watched the entire strategy and theory of the state's case. He had the opportunity to view all of that evidence. And then at that point, before he's got to put on his own trial, he elects to proceed differently. I think that's kind of exactly the case that invited error is meant to address. And so in these circumstances, I think it would be appropriate. With regard to the – I do want to touch back on the PC argument. With regard to that, counsel cited People v. Beach, an Illinois Supreme Court case that stated, you know, we don't want to automatically call post-conviction review as a necessary procedural element for all effective assistance claims. I believe that's what he stated that case stood for. But I would say in Beach, the court said, in our view, ineffective assistance claims may sometimes be better suited for collateral proceeding when the record is incomplete or inadequate. And I think this case falls squarely within the exception that the Beach case is talking about because there's just simply not enough evidence. And with regard to the sentencing issue, I think, as counsel noted, we're both in agreement that remand is not necessary. But I think in the interest of judicial economy, this court could just enter the conviction on count one, which I contend is the more serious of the counts because despite the fact that they both – count one and count two involve the intent mens rea, the intent to kill, I think, is a more culpable state of mind than the intent to cause great bodily harm. And so in the interest of judicial economy, I would urge this court to exercise its authority under Rule 615 and modify the sentence to enter a conviction on count one. And I would also ask the court to confirm that it's conviction. Are there any questions?  Thank you, Your Honor. Thank you, Mr. Adler. Mr. Connelly, Senator Butler. Thank you, Your Honors. First off, I can't say that I've discussed this possibility with my client, but I imagine that if Your Honors were to remand this directly for an evidentiary hearing on this issue as counsel has suggested that you might do, I think my client would probably consider that a win at this point. In terms of the sentencing issue, again, the result is the same either way. It's less important to me how you get there, but I do believe the law is clear that intent is intent, and we don't get to decide at this level which intent is more serious. And at the end of the day, I mean, at the end of the day, does it make an ounce of difference? Your Honor, it does not. With the exception of maintaining solid and consistent body of law, and that body of law says that we have to remand. I wish we didn't, but that's what the Supreme Court has said that we have to do in these situations. And going back to, again, what seems to me, again, confess, we're all doing a lot of speculating here, but you're a defense lawyer, a trial lawyer, and this alibi witness comes into your office and he says, hey, I thought I ought to talk to a lawyer because I'm going to go testify as an alibi witness for my friend who's charged with murder. And he said somebody drove him around looking for the victim, killed the victim on the way, and I already told him I'd testify that I was driving him around that day, but we didn't shoot anybody. And I'd like to go do that. And don't you think a lawyer's going to say, gee, I'll take bad ideas for a thousand, Alex. I don't think you want to put yourself in the car with that guy on the day of the crime. I think that a competent attorney in that situation is going to investigate that situation. If the hypothetical there is someone representing Mr. Davis, I don't know the answer to that. Because, again, there's more speculation there. We don't know what route they took out of town, etc. Bottom line is that we can ask these kinds of questions in every single case that appears before your honors. What the state is trying to do here is force Mr. Crockwell to prove a negative. We have a comprehensive explanation for why counsel did this thing. And speaking of that thing, I would have to respectfully disagree that this corpus electi argument was in any way plausible at all. This is not a matter of this is the best we have, and so we move forward with this frivolous argument. Which is the thing that happens? There are cases on that. But that is not what happened here. Counsel misread these cases. And you can read these cases yourselves, your honors. They do not state what he said they said. And that's why this decision was not reasonable. Is there anything in the record that would suggest whether this attorney had had any idea about the existence of this argument earlier? When it came to him that this was a really dead bang winner? The way that he explains it on the record is that he has listened to the state's evidence. He is reviewing the state's evidence up to that point, that last day. And opposing counsel is correct. It's not at the very end of the state's case. The state did put on some technical evidence after that. But apparently that night or that morning, he had reviewed that evidence, and this thought occurred to him. Wait a minute. They have not done anything to tie Tommy to this crime. Thank you. And then he went with it. Okay. So Justice Schmidt started off discussing a scenario that is consistent with Mr. Wright's testimony being true, but it does pose a risk for him. And if the attorney came just recently to know about this theory that he thought was going to win the case without having to call Mr. Wright, he could have done that. Well, first off, again, and I apologize for sort of declining to answer the question before, but I do question how much risk that would have put Mr. Wright in. Let's say what he is saying is true, okay? He is in a car with Mr. Crockwell. There is no crime in being in a car with Mr. Crockwell. That's how Mr. Crockwell gets out of University Park that evening. And he needs that testimony in order for this theory, the original factual theory, to work. The way it is now, it's much more a situation, as Justice Schmidt, you were suggesting, well, I love my son, but I'm not sure that that makes any sense. He needs this evidence that he was not involved. And it just doesn't work every once in a while. No, I agree with you. And I guess what I was saying was that there is a way that the attorney would perhaps succeed to Mr. Wright's reluctance to testify. Well, the other response to that is that he does not represent Mr. Wright. And if Mr. Wright wants to get on the stand and plead the fifth, then he has an entirely different problem. Mr. Crockwell's attorney has an entirely different problem. And it's an entirely different case. If there are no other questions, we would ask that you reverse the command for the proceedings in other words. Thank you. Thank you both for your arguments here this morning. We'll take this matter under advisement. I'd like to just position that we'll be listening.